# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 C 7554 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| TOM WIERINGA, as personal guarantor, | ) | Magistrate Judge Denlow |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ford Motor Credit Company ("Ford") has sued Thomas Wieringa ("Wieringa") for breach of contract. Ford claims that Wieringa has failed to honor his commitment personally to guarantee the financial obligations of Carry Companies of Illinois ("Carry"). Before the court are the parties' cross-motions for summary judgment. For the reasons stated below, plaintiff's motion for summary judgment is granted in part and denied in part; defendant's motion for summary judgment is denied.

## BACKGROUND[1]

### A.    The Parties and the Contract

Ford is engaged in the business of selling and leasing new and used trucks, automobiles, and other vehicles. Carry is a transporter and warehouser of liquid and dry food products. In 1997 and 1998, Wieringa served as Carry's president.

In 1997, Carry entered into a contract with Frito-Lay. Under the agreement, Carry was to

---

[1] The narrative that follows is adapted from the parties' Local Rule 56.1 statements.

transport potatoes, which were to be used in the production of Frito-Lay's "WOW" brand potato chips, to various Frito Lay processing plants. Due to the large volume of potatoes involved, Carry sought to purchase sixty new refrigerated trailers ("the vehicles" or "the trailers") manufactured by Stoughton Trailers ("Stoughton"). To obtain financing for the purchase, Carry retained a broker, Anthony Nazaroski, and Nazaroski's finance company, Capital Development Services. In May of 1998, Carry entered into a "Commercialease Lease Agreement" ("the agreement") with Ford. Wieringa executed a document under which he agreed unconditionally to guarantee Carry's present and future obligations to Ford.

The lease's term was for 96 months (8 years) and was intended to run from May 1998 through May 2006. The parties agreed to a capitalized cost of $54,342.60 for each trailer. The parties also set the "residual value" of each vehicle at twenty percent of the capitalized cost (i.e., $10,868.52). The monthly finance charge was $681.08 per vehicle, for a total monthly charge of $40,864.80. Finally, the parties agreed upon an "early termination value" ("ETV") for the trailers. The ETV was based upon a combination of the vehicle's capitalized cost and its residual value. Thus, for example, in the first month, the ETV for each trailer was $53,661.52 ($54,342.60 - $681.08); and in each succeeding month, the ETV for each vehicle would be reduced by $681.08.

Upon expiration of the agreement, Ford could either dispose of the trailers itself or designate Carry to sell them. If the vehicle's sale price was less than its residual value, Carry would be responsible for the deficiency; if the sale price was greater than the residual value, Carry would receive the surplus. Ford could terminate the lease at any time if Carry failed to make its monthly payments. Carry, too, could terminate the contract at any time, either by selling the trailers or by returning them to Ford for sale. If the sale price fell short of the ETV, Carry would be required to

pay the deficiency. Carry also could purchase any of the trailers at any time by paying the trailer's ETV.

Under the agreement, Carry was responsible for licensing, registering, and titling each vehicle. Carry also was required to pay the vehicles' insurance costs, operating expenses, and taxes. If one of the trailers was lost or damaged, Carry was responsible for paying the vehicle's ETV.

### B.     Carry's Failure to Make Payments

Initially, Carry had no difficulty meeting its obligations under the contract. Indeed, in December of 2000, Carry bought five of the trailers and sold them to another party; and in February 2001, Carry purchased three additional trailers.

In May 2001, however, due to slackening demand for WOW potato chips, Frito-Lay cancelled its contract with Carry. Carry was able to make all of its payments through December 2001, and executed four "Commercialease Lease Deferral Addenda," which allowed Carry to defer certain payments. In exchange, Wieringa executed a separate "Reaffirmation and Guarantee" for each lease addendum, confirming his liabilities and obligations for Carry's obligations to Ford.

Sometime between March and May of 2002, however, Carry became unable to make its payments. Ford sent a letter to Carry demanding payment of $107,576.60, which Ford claimed was due under the agreement. When Carry made no payments, Ford sent Wieringa a letter on August 13, 2002, demanding payment of $103,949.87, if he wished to avoid termination of the lease. Ford sent another letter on August 19, 2002 to the same effect. Wieringa admits to receiving the letters. Neither he nor Carry paid the demanded amount.

The agreement was terminated at the end of August 2003. While the parties agree that the agreement in fact was terminated, they disagree over who terminated the contract and exactly when

it was terminated: Wieringa claims that he cancelled the agreement on August 28, 2002; Ford claims that it cancelled on August 30, 2002.

### C. Post-Termination Events

Ford repossessed forty-four of the trailers between January and March of 2003. Ford claims that it contacted Wieringa repeatedly in an attempt to arrange for the return of the eight remaining vehicles. Wieringa admits that Ford may have "made a few phone calls," but claims that he was unaware that Ford sought the return of the vehicles.

Ford eventually filed a replevin action in Cook County Circuit Court in November 2002. On March 17, 2003, Cook County Judge Alexander White entered an Order of Replevin, requiring the return of the remaining vehicles. The order was executed by the Cook County Sheriff, but none of the vehicles was recovered. On April 24, 2003, Ford filed a motion for civil contempt sanctions.[2] Some time later, one vehicle eventually was returned. Wieringa sold the other seven without inspection by Ford, the proceeds from which, Ford claims, were applied to Wieringa's outstanding balance.[3]

Ford arranged to have the recovered vehicles sold at three separate auctions held in March, April, and May of 2003. The auctions were handled by Fort Wayne Vehicle Auction ("Fort Wayne"), an experienced seller and marketer of vehicles and the largest auction facility in the Midwest. The auctions were advertised in *Farm World*, and *Truck Paper Great Lakes*, a publication

---

[2] The outcome of the contempt motion is unclear. It does not appear that Wieringa was sanctioned.

[3] The parties dispute whether Carry and/or Wieringa made payments after the termination: Ford claims that Wieringa failed to make any additional payments; Wieringa claims that he made payments in May and August of 2003.

that reaches over half the country.  Fort Wayne also circulated fliers announcing the auction.[4]

Although not specifically required by the agreement, Ford sent Wieringa notices of the sales on

those dates.  Wieringa admits receiving notice of at least one of the sales and concedes that he did

not object to the sale.  He contends, however, that he was unaware that the sale was to be conducted

via auction.

Several hundred people attended each of the auctions, and all of the vehicles were sold.  The

prices ranged from $9,250.00 to $15,750.00.  Ford claims that it incurred a total of $44,037.24 in

expenses in connection with selling the vehicles, and that it is owed a total of $1,314,373.37 as a

result of Carry's default.  Neither Carry nor Wieringa has made any payments toward this amount.

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  The party opposing summary judgment may not rest upon the pleadings, but "must

set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  There is no genuine issue for trial unless there is "sufficient

evidence favoring the non-moving party for a jury to return a verdict for that party."  *Id.*  The party

moving for summary judgment bears the initial burden of demonstrating the absence of a genuine

---

[4] While the parties agree that Fort Wayne typically advertises its auctions by contacting 2,000 to 3,000 customers by phone, Wieringa contends that Ford produced no evidence that such a telemarketing effort was undertaken in this case.  Wieringa conceded, however, that Fort Wayne's motive is to obtain the highest price possible for auctioned goods.

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## II.    WIERINGA'S MOTION FOR SUMMARY JUDGMENT

The court first considers Wieringa's motion for summary judgment.  Wieringa contends that, despite the fact that the agreement between Carry and Ford is expressly styled as a lease, the agreement should in fact be regarded as a security agreement.  As a result, Wieringa contends, the agreement is governed by Article 9 of the UCC (and the corresponding provisions of Michigan law, Mich. Comp. Laws § 440.9101 *et seq.*[5]), not UCC Article 2A.  Under Article 9, a creditor who intends to dispose of collateral at a sale must provide notice to the debtor.  If the sale takes place at a private sale, the creditor need only notify the debtor of the date after which the sale is to take place and inform the debtor that he is entitled to an accounting of the unpaid indebtedness.  If the disposition takes place via a public sale, however, the debtor must be notified of the date, time, and place of the sale.

The parties agree that although the vehicles were disposed of at a public sale, Ford's formal notice conformed only to the requirements for private sales: Wieringa was told only that the vehicles would be sold at a private sale after a specified date; he was not told of the date, time, and place of the auctions.  Wieringa claims that under Michigan law, Ford's failure to provide him with proper notice precludes Ford from recovering any deficiency judgment.

Wieringa's motion is premised entirely on his contention that the Commercialease agreement was not a "true lease" but instead was a security agreement.  The burden of proof is on Wieringa to demonstrate that the agreement should be viewed as something other than what it purports to be.

---

[5] The commercialease agreement contains a Michigan choice-of-law provision.  Neither party contests that Michigan law applies to this dispute.

*See, e.g.*, *In re WorldCom, Inc., Bankruptcy*, No. 02-13533 (AJG), Adversary No. 03-92903 (AJG), 2006 WL 280797, at *5 (Bankr. S.D.N.Y. Feb. 7, 2006) (the burden of proof at trial rests with the party seeking to characterize the agreement as something other than what it purports to be); *see also In re Zaleha*, 159, B.R. 581, 586 (Bankr. D. Idaho 1993) ("[W]here the transaction is denominated a lease, the burden is upon the debtor to demonstrate that the transaction is in fact a disguised security interest rather than a true lease."). To succeed on a motion for summary judgment, Wieringa must satisfy the same burden of proof as would be applicable at trial. *See Celotex*, 477 U.S. at 325. The court concludes that Wieringa has failed to show that the agreement was a security interest rather than a lease.

### A. Lease vs. Security Interest

A lease involves payment for the temporary possession, use, and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt. *In re WorldCom*, 2006 WL 280797, at *6 (citing James J. White & Robert S. Summers, Uniform Commercial Code vol. 4, § 30-3, 14 n. 18 (5th ed. West 2002)). Determining whether an agreement is a lease or a security agreement is often very difficult. *See, e.g.*, *In re Charles*, 278 B.R. 216, 221 (Bankr. D. Kan. 2002) ("The issue of whether so-called 'finance leases' are in reality security agreements has vexed the courts for many years."); *see also* Edwin E. Huddleson, III, *Old Wine in New Bottles: UCC Article 2A–Leases*, 39 Ala. L. Rev. 615, 625 (1988) ("[D]rawing [the] distinction in specific cases [between

leases and security interests] has proved to be a difficult and frequently litigated problem.").[6]

Michigan law (incorporating the UCC) sets forth a number of criteria for distinguishing between a lease and a security interest. Specifically section 440.1201(37) states that "[w]hether a transaction creates a lease or security interest is determined by the facts of each case." Mich. Comp. Laws. Ann. § 440.1201(37). The statute continues:

> [A] transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and any of the following:
>
> (a) The original term of the lease is equal to or greater than the remaining economic life of the goods.
>
> (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.
>
> (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.
>
> (d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Mich. Comp. Laws § 440.1201(37)(a)-(d).[7] Although Wieringa cites section 440.1201(37), he

---

[6] *In re Owen*, 221, B.R. 56, 61 n.6 (Bankr. N.D.N.Y. 1998) ("Because the Uniform Commercial Code ('UCC') has been adopted by a majority of states, decisions from other jurisdictions interpreting the same provisions of the UCC are relevant to this Court's analysis.").

[7] Ford argues that the lease agreement unambiguously states that the agreement is a lease subject to Article 2A and that Ford is entitled to rely on the unambiguous language. This contention is mistaken in two way. First, the contract is not unambiguous. It says that Wieringa is subject to Article 2A's protections, but does not rule out application of Article 9. Second, even if the contract were unambiguous, it would not follow that it was subject to Article 2A. Michigan courts have looked past much clearer language than that present here in determining whether an agreement constituted a lease or a security interest. *See, e.g.*, *Amerus Leasing, Inc. v. Sterling Warren Pharmacy, Inc.*, No. 203496, 1998 WL 1990423, at *4 (Mich. Ct. App. Aug. 18, 1998).

makes little effort to show that the agreement specifically satisfies any of the statute's requirements.

The court finds that the agreement meets section 440.1201(37)'s threshold requirement: Carry was unable to terminate the consideration it was required to pay Ford for the term of the agreement. While it is true that Carry could terminate the lease at any time, it would be required to pay the vehicles' early termination value upon doing so. As many courts have held, a lessee whose ability to terminate a lease is subject to such consequences does not have the right to "terminate" within the statute's meaning. *See, e.g.*, *In re QDS Components, Inc.*, 292 B.R. 313, 334 (Bankr. S.D. Ohio 2002) (payment obligation was not subject to termination where lease agreement required debtor to pay upon termination the equivalent of all monthly installment payments required under full contract term); *In re Hoskins*, 266 B.R. 154, 160 (Bankr. W.D. Mo. 2001) (termination provision under which a lessee remains financially liable to the lessor after termination of the lease for payments that become due after the date the lease is terminated does not constitute "termination" within the meaning of section 1-201(37)); *Coleman v. DaimlerChrysler Services of North America, LLC*, 623 S.E.2d 189, 191 (Ga. Ct. App. 2005) (same).

However, the court finds that the agreement fails to meet any of the statute's subsections. Subsection (a) is inapplicable since Wieringa nowhere claims, much less shows, that the term of the leases was equal to or exceeded the vehicles' remaining economic lives. Indeed, as Ford points out, the agreement's provisions specifying the residual value of the vehicles expressly embodies the parties' shared assumption that the vehicles' economic lives extended beyond the term of the agreement. Subsection (b) is inapplicable since the agreement neither required Carry to become owner of the goods – Carry could either purchase the vehicles or return them to Ford for sale – nor

required Carry to renew the lease for the vehicles' remaining economic lives. Subsection (c) is inapplicable since the lease contained no renewal option. Subsection (d) is inapplicable because, while Carry had the option of purchasing the vehicles, Wieringa nowhere argues that Carry could do so purely for nominal consideration.[8]

## B. Other Factors

While meeting the factors listed in section 440.1201(37)(a)-(d) conclusively establishes the existence of a security interest, failure to meet those factors does not conclusively establish the absence of security interest. Rather, the court may look to additional features of an agreement to determine whether a security interest has been created. *See, e.g.*, *Essex Crane Rental Corp. v. Superior Equipment*, No. 94-1733, 1996 WL 253885, at *2 (6th Cir. 1996).

Wieringa cites a number of the agreement's features in support of his contention that it is a disguised security agreement rather than a true lease. He argues, for example, that Carry's overall charges were in excess of the amount that Ford paid to finance the trailers. The court is not persuaded. Indeed, as Ford points out, section 440.1201(37) specifically provides that a

---

[8] Nor does the court find that the required consideration was merely nominal. While there is no hard-and-fast test for determining whether consideration is to be deemed "nominal," such a finding typically is made where the items in question are sold for $1. *See, e.g.*, *In re Pillowtex, Inc.*, 349 F.3d 711, 719 (3d Cir. 2003). In contrast, courts have found sale prices similar to those contemplated in the agreement here *not* to be nominal. *See, e.g.*, *Williamson v. Masse Lincoln-Mercury*, No. 189869, 1997 WL 33345055, at *3 (Mich. Ct. App. June 17, 1997) (affirming lower court's finding that option to purchase the equipment at end of lease for a price not to exceed fifteen percent of the original equipment cost was not nominal consideration); *cf. See, e.g.*, *In re Taylor*, 209 B.R. 482, 486-87 (Bnkr. S.D. Ill. 1997) (rejecting argument that an option to purchase equipment at end of 60 month lease for 20% of fair market value was nominal).

"transaction does not create a security interest merely because ... [the] present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into." Mich. Comp. Laws § 440.1201(37). Wieringa also argues that the agreement created a security interest because, upon expiration, Carry would either own the trailers (after paying the residual value) or (if the vehicles were sold) would collect any excess or pay any deficiency. But many courts have found agreements with the same provisions to be true leases, not security interests. *See, e.g.*, *In re Beckham*, 275 B.R. 598, 600 (D. Kan. 2002) (finding true lease where agreement provided that upon expiration or termination, vehicles would be sold with residual value of vehicle determining whether the lessee owes lessor or vice versa); *In re Damron*, 275 B.R. 266, 268 (Bankr. E.D. Tenn. 2002) (finding agreement to be a true lease where, at end of five-year term, lessee was required either to purchase vehicle for its "Estimated Residual Value" or pay lessor any shortfall received upon sale or give excess to lessee); *In re Mepco, Inc.*, 276 B.R. 94, 103 (Bankr. W.D. Va. 2001) (lease found where lessee could sell vehicles at end of lease term but was under no obligation to do so and could simply rely on its right to pay lessor the difference between book value and actual value); *see also Mejia v. Citizens & Southern Bank*, 332 S.E.2d 170, 171-72 (Ga. Ct. App. 1985).

Wieringa also argues that the agreement should be deemed a security interest because Carry was required to pay for the title, insurance, and operating expenses of the vehicles, and to bear the risk of loss. But Michigan law specifically states that such features do not establish the existence of a security interest. *See* Mich. Comp. Laws § 440.1201(37)("A transaction does not create a security interest merely because it provides ... [that the] lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs

with respect to the goods."). Similarly, Wieringa attempts to make much of the fact that the agreement was a TRAC lease (so named because it contains a "terminal rental adjustment clause"), pointing to cases in which courts have found such leases to be disguised security arrangements. But the mere designation of an agreement as a "TRAC lease" hardly necessitates a finding that the agreement is not a true lease. *See, e.g.*, *In re Charles*, 278 B.R. 216, 225 (Bankr. D. Kan. 2002) (as a matter of law TRAC lease was financing lease, not a secured transaction); *In re Rebel Rents, Inc.*, 291 B.R. 520, 529 (Bankr. C.D. Cal. 2003) (debtor failed to satisfy burden of demonstrating that leases with TRAC clauses were security agreements rather than true leases as denominated on their face); *cf. In re Owen*, 221 B.R. at 64 (given presumption under New York law that TRAC leases were in fact true leases, debtors failed to show that agreement was installment sales contract).[9]

---

[9] Wieringa argues that Carry was the owner of the vehicles under any and all circumstances. He states that there were five possible outcomes or dispositions: (1) Carry had the option of terminating the lease at any time by purchasing the vehicle and paying Ford the vehicle's early termination value; (2) at the end of the lease, Ford had the right to sell the trailers (or to designate Carry as the seller of the trailers), with Carry paying any deficiency (if the sale price was less than the assumed residual value) and with Carry receiving any balance (if the sale price exceeded the residual value); (3) if a vehicle was lost or destroyed, Carry was responsible for the early termination value; (4) if Ford terminated the lease, Carry was responsible for the early termination value; and (5) if Carry terminated the lease without purchasing the vehicle, Carry was responsible for selling the vehicle and giving the proceeds to Ford.

It is not clear whether Wieringa has identified all possible outcomes under the agreement. For example, although Ford's response brief does not specifically address this part of Wieringa's argument, it appears that Ford could simply retake possession of the vehicles upon the expiration of the lease without selling them. Paragraph 11(a) of the agreement provides that the "Lessor may at its option sell such Leased Vehicle in an arm's length transaction within 30 days after the expiration of this lease ...." The word "may" here indicates that Ford was not *required* to sell the vehicles. In other words, upon expiration of the lease, Ford essentially could have done as it wished with the trailers. This betokens ownership on Ford's part. *See, e.g.*, *Addison v. Burnett*, 49 Cal. Rptr. 2d 132, 138-39 (Cal. Ct. App. 1996) (the fact that a lessor is under no obligation to dispose of vehicle at end of lease is among factors indicating true lease). Nor, at any rate, do these possible outcomes support Wieringa's claim that "Carry was the owner of the refrigerated trailers under any and all circumstances." Def.'s Mot. Summ. J., at 9-10. As discussed more

**C.      Conclusion**

The court thus finds that the agreement is a true lease, not a security agreement.  It is true that courts in other jurisdictions have found security agreements under circumstances bearing some similarity to those present here.  The court's conclusion, however, is supported by a recent Ninth Circuit decision involving Ford and a lease with provisions identical to those at issue here.  In *Ford Motor Credit Co. v. Segal*, No. CV-01-03830-GAF, slip op. (C.D. Cal. July 24, 2002), the defendant guaranteed a corporation's obligations under a commercial lease agreement with Ford.  The corporation defaulted and the defendant refused to pay the deficiency after Ford sold the repossessed items.  Like the agreement here, the lease contained a Michigan choice of law provision.  In addition, the lease contained an early termination provision identical to the one at issue here.

In opposing Ford's motion for summary judgment, the defendant claimed that the agreement was a security interest rather than a lease.  *Id*. at 3.  The court disagreed, finding that the "Lease Agreement and Lease Supplements are characteristic of true leases because they do not purport to transfer title and they provide that the Leased Units be returned to Ford Credit at the end of the 60 months term."  *Id*. at 9.  On appeal, the Ninth Circuit affirmed.  *See Ford Motor Credit Co. v. Segal*, 97 Fed. Appx. 166, 168 (9th Cir. 2004).

In contrast, Wieringa cites only a single case in support of his position, *John Deere Co. v. Wonderland Realty Corp.*, N.W.2d 871 (Mich. Ct. App. 1972).  That case is inapposite for several reasons.  First, *Wonderland* was decided prior to the section 440.1201(37)'s amendment in 1992, which narrowed the factors to be considered in determining whether a lease was to be deemed a

---

fully *infra*, the terms of the lease here are quite similar (and in some cases identical) to those that courts have found to be true leases, not security agreements.

security interest. *See, e.g.*, *Automobile Leasing, Inc. v. National Coach Engineering, Inc.*, No. 189434, 1996 WL 33347698, at *1 (Mich. Ct. App. Dec. 17, 1996) (noting that 1992 amendments excluded several factors previously recognized as indicating the parties' intention to create a security interest). *Wonderland* also is easily distinguishable on its facts. As Ford correctly points out, for example, the contract in *Wonderland* permitted the lessee to become owner of the equipment in question for no additional consideration. *Id*. at 873. Under the agreement here, Wieringa could become owner of the trailers only upon payment of twenty percent of the vehicles' residual value. As noted above, Wieringa does not assert that this amount was merely nominal, and the court does not find it to be so.[10]

The court concludes that Wieringa has failed to carry his burden of showing that the agreement created a security interest rather than a true lease. Since Wieringa's contention that Ford is barred from recovering any deficiency judgment rests entirely on the contention that the agreement was not a lease, Wieringa's motion for summary judgment is denied.

## III.    FORD'S MOTION FOR SUMMARY JUDGMENT

In his response to Ford's motion for summary judgment, Wieringa does not dispute Ford's contention that Carry breached the contract. Wieringa admits that Carry ceased making its monthly payments. Def.'s Resp. to Facts at 6. Wieringa also admits that both he and Carry failed to return the vehicles within thirty days of the agreement's termination, despite their contractual obligation

---

[10] In his reply brief, Wieringa cites a number of other cases. These, too, are of dubious value. For example, the principal case Wieringa cites, *In re Grubbs Const. Co.*, 319 B.R. 698, 704 (Bankr. M.D. Fla. 2005) has not been followed by other courts. *See In re Shores*, 332 B.R. 31, 36-38 (M.D. Fla. 2005).

to do so. Def.'s Resp. to Pl.'s Stmt. Add'l Facts, ¶ 5. Wieringa disputes only Ford's deficiency calculation and the commercial reasonableness of Ford's disposition of the vehicles. Since the latter issues pertain only to the extent of Ford's damages, and not to the question of Ford's liability, the court grants Ford summary judgment on the issue of liability. *See, e.g.*, *Citicorp Leasing, Inc. v. United American Funding, Inc.*, NO. 03 CIV.1586 WHP, 2005 WL 1847300, at *8 (S.D.N.Y. Aug. 5, 2005) (issue as to commercial reasonableness is relevant to the amount of damages, not to liability); *Federal Deposit Ins. Corp. v. Rodenberg*, 571 F. Supp. 455, 462 (D. Md. 1983) ("[A] failure to act reasonably in disposing of collateral will only affect the amount of damages recoverable from the guarantor, not extinguish his liability."); *Atrium Funding Corp. v. McRoberts*, No. 14328-2005, 2006 WL 216690, at *3 (N.Y. Sup. Ct. Jan. 27, 2006) ("If the issue of commercial reasonableness is raised, the Court in an appropriate case may grant judgment on the issue of liability and set the matter down for an inquest as to the issue of damages.").

With respect to the issue of damages, the court questions the parties' apparent assumption that the "commercially reasonable" standard is applicable at all here. That standard applies in cases involving secured transactions, not leases. *See, e.g.*, *Siemens Financial Services, Inc. v. PhyMed Diagnostic Imaging Center of Dallas, Inc.*, No. 3-99-CV-0307-BD, 2000 WL 728916, at *2 (N.D. Tex. June 6, 2000) (since the agreement was a lease and not a secured transaction, there was no requirement that the leased good be repossessed and sold in a commercially reasonable manner); *Sharer v. Creative Leasing, Inc.*, 612 So.2d 1191, 1196 (Ala. 1993) (lease agreement did not create a security interest and therefore was not subject to UCC Article 9's commercial reasonableness requirement); *LMV Leasing, Inc. v. Conlin*, 805 P.2d 189, 197 (Utah Ct. App. 1991) (UCC provisions did not apply since court concluded that the agreement was a true lease); *Moore v. Ford*

*Motor Credit Co.*, 778 S.W.2d 657, 658 (Ky. Ct. App. 1989) (same); *Citizens & Southern Nat. Bank v. Thomas*, 372 S.E.2d 687, 688 (Ga. Ct. App. 1988) (since agreement was a true lease rather than a disguised secured transaction, the trial court erred in directing a verdict for defendant based upon plaintiff's failure to prove that its sale of the vehicle had been conducted in a commercially reasonable manner as required by the UCC); *see also* Lary Lawrence, Anderson on the Uniform Commercial Code, § 9-504:66 (3d. ed. 2005).

Having found that the agreement here is not a secured transaction, Ford's conduct in disposing of the trailers would seem to be governed by general principles of contract law, such as an injured party's duty to mitigate damages. *Segal*, No. CV-01-03830-GAF, at 9-10; *Conlin*, 805 P.2d at 193 ("If the contract is a true lease agreement, fundamental principles of contract law apply to the case, and liability for damages is established merely by showing a breach of the agreement's provisions. Under the provisions of the agreement, failure to dispose of the vehicles in a commercially reasonable manner goes only to the issue of damages."). Neither of the parties addresses whether Ford's disposition of the vehicles was reasonable under common law contract principles. To the extent that such principles should be used to assess Ford's disposition of the vehicles, Ford is not entitled to summary judgment on the issue of damages.

On the other hand, even if the "commercially reasonable" standard applies, summary judgment on the issue of damages still would be inappropriate. Wieringa has produced evidence calling into question the reasonableness of the sale. Among other things, Wieringa argues that Ford failed to have the vehicles independently appraised and that Ford has produced no evidence as to the number of individuals who bid on the vehicles. Richard J. Johannes ("Johannes"), Wieringa's expert, testified that Ford's characterization of the sale as "absolute"– a term indicating the absence

of any fixed minimum price – may have resulted in lower prices than might otherwise have been obtained.[11]  Def.'s App. Opp. Pl.'s Mot. Summary Judgment, Ex.Q, 110:17-111:6.  Johannes's testimony also can be viewed as calling into question Ford's advertising and other efforts with respect to the auctions.  *Id.* at 107:20-110:16.  Wieringa further points out that the vehicles were sold for between $9,000 and $17,000.  When the vehicles were sold, however, each had an ETV of $40,000.  *See* Pl.'s Resp. to Def.'s Stmt. Undisputed Mat. Facts, ¶ 55.  Furthermore, Wieringa points out that he was able to sell the several vehicles in his possession for $39,000.  *See* Pl.'s Resp. to Def.'s Add'l Stmt. Material Facts, ¶ 79.  Ford may well be correct that the comparatively low prices for which it sold the vehicles can be explained without calling into question the commercial reasonableness of the sale.  Based on the evidence Wieringa has advanced so far, however, a reasonable jury could find that the sale was not commercially reasonable.

Consequently, while the court grants Ford's motion for summary judgment on the issue of Wieringa's liability, the court denies summary judgment on the issue of damages.[12]  *See, e.g.*, *Ford Motor Credit Co., Inc. v. Racwell Const., Inc.*, 808 N.Y.S.2d 294, 295-96 (N.Y. App. Div. 2005) (summary judgment was appropriate as to liability but not as to damages, because questions of fact remained concerning commercial reasonableness of disposition).

---

[11] In its orders of June 8, 2005 and July 7, 2005, the court denied Ford's motion to exclude Johannes.

[12] Because the court finds a triable issue of material fact as to whether Ford properly mitigated its damages or disposed of the vehicles in a commercially reasonable manner, it follows that Ford is not entitled to summary judgment on the amount of the alleged deficiency. Wieringa also argues that Ford's motion for summary judgment motion should be denied because Ford failed to provide Wieringa with proper notice of the sale of the vehicles.  Having rejected the same argument in connection with Wieringa's motion for summary judgment, the court need not revisit the issue in connection with Ford's motion.

## IV.    ADDITIONAL MATTERS

The court here addresses a number of additional and ancillary matters relating to the present litigation.

### A.    Exclusion of Documents and Evidence

First, both parties have asked the court to exclude certain documents and evidence in considering this motion and possibly at trial.  In its motion for summary judgment, Ford asks the court to strike the affidavit Wieringa submitted in support of his motion for summary judgment. Specifically, Ford contends that Wieringa's affidavit is "not based on his personal knowledge, but instead is cluttered with speculation, hearsay and conjecture."  Pl.'s Mot. Summ. J., at 4.  Because it was unnecessary to consider the affidavit in order to rule on the parties' motions for summary judgment, Ford's  motion to strike is denied as moot.[13]  *See, e.g.*, *Humphries v. CBOCS West, Inc.*, 392 F. Supp. 2d 1047, 1052 (N.D. Ill. 2005) (motion to strike denied as moot because court did not rely on statements contained within the declaration); *O'Phelan v. Federal Express Corp.*, No. 03 C 00014, 2005 WL 2387647, at *1 (N.D. Ill. Sept. 27, 2005) (same).

For his part, Wieringa has submitted a motion to bar Ford's use of evidence obtained from a third-party subpoena served on Frito-Lay in September 2004.  Wieringa objects that the subpoena was issued after August 2, 2004, when discovery was ordered closed in the case.  He also objects

---

[13] Indeed, the parties themselves largely concede that Wieringa's affidavit is not centrally relevant to the questions at issue in the motions.  Defendant states, for example, that Wieringa's "statements about the timeliness of payment prior to default have no substantial bearing on the issues raised by Wieringa's Motion for Summary Judgment, which concerns Ford's actions after repossession."  Def.'s Reply Mem. Summ. J., at 4.  For its part, Ford states that "[i]n any case, Wieringa's claims in this regard  do not call into question the underlying contract, the admitted breach, or the undisputed damages set forth by Ford Credit."  Pl.'s Reply Mot. Summ. J., at 5.

that Ford failed to provide Wieringa with notice of the subpoena as required by Fed. R. Civ. P. 45, and that Ford did not provide copies of the documents to defense counsel until June 2005, just two days before the parties' reply briefs in support of their respective motions for summary judgment were due. Ford has admitted these failures but contends that they were due to inadvertence, not bad faith.

The court denies as moot Wieringa's motion to bar use of the evidence in Ford's reply brief. The documents and evidence in question pertain only to the question of whether Ford's disposition of the repossessed vehicles was commercially reasonable. On that question, the court has found in Wieringa's favor and has denied Ford's motion for summary judgment. Nor, in any event, were the documents and evidence in question essential to any part of the court's findings or conclusions.

The court also denies Wieringa's request that the evidence in question be excluded at trial. Although Ford's counsel provided the documents too late for Wieringa to make use of them in his summary judgment briefs, he has been in possession of the documents for approximately ten months. At this time, the court is unable to see whether, and to what extent, Wieringa might be prejudiced at trial as a result of Ford's conduct. The court's denial is without prejudice to Wieringa's ability to file a pretrial motion *in limine* to bar the documents received pursuant to the subpoena or any evidence relating thereto. *See, e.g.*, *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 562-63 (S.D. Cal. 1999) (although defendants' subpoena was an improper attempt to obtain evidence after close of discovery, plaintiff's motion to bar evidence at trial was denied because prejudice to opposing party was unclear); see also *Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 381-82 (D. Md. 1999) (although plaintiff violated Rule 45 by issuing non-party subpoenas without notice to opposing counsel, plaintiff would not be precluded from using the

documents at trial).

**B.      Pleading Defects**

The court notes that plaintiff's complaint alleges that the court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332, stating that Ford is a Delaware Corporation with its principal place of business in Dearborn, Michigan, and that Wieringa has his domicile in Oak Brook, Illinois. Later, however, the complaint states that for diversity purposes, Ford is a "resident" of Michigan and Wieringa is a "resident" of Illinois. In other words, the complaint appears to conflate "citizenship" and "residence."

It is well settled that residence and citizenship are not synonymous for the purposes of the diversity jurisdiction. *See, e.g.*, *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799 (7th Cir. 2003). Since a corporation's citizenship is determined by its principal place of business and its state of incorporation, and an individual's citizenship is determined by his or her domicile, the court is confident that jurisdiction is proper over this suit. Nevertheless, in order to remove all doubt and to bring the pleadings into strict compliance with the diversity statute, Ford is advised to amend its complaint within ten days of the date of this order by replacing its references to the parties' residence with references to the parties' citizenship.

**CONCLUSION**

For the foregoing reasons, Ford's motion for summary judgment is granted in part and denied in part. Wieringa's motion for summary judgment is denied.

ENTER:

/s/_____

JOAN B. GOTTSCHALL

United States District Judge

Dated: March 28, 2006